**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

BOBBY COLE,                                    )
                                               )    CASE NO.    1:07-cv-1848
            Plaintiff,                         )
                                               )
      v.                                       )    MAGISTRATE JUDGE VECCHIARELLI
                                               )
MICHAEL J. ASTRUE,                             )
   Commissioner of Social Security             )    **MEMORANDUM OPINION & ORDER**
                                               )
            Defendant.                         )

      Plaintiff, Bobby Cole ("Cole"), challenges the final decision of the Commissioner of

Social Security, Michael J. Astrue ("Commissioner"), denying Cole's claim for Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423

and 1381(a).  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is

before the undersigned United States Magistrate Judge pursuant to the consent of the

parties entered under the authority of 28 U.S.C. § 636(c)(2).

      For the reasons set forth below, this Court VACATES the final decision of the

Commissioner and REMANDS the case to the ALJ for further action consistent with this

opinion.

I. Procedural History

On January 25, 2002, Cole filed an application for SSI.  His application was denied initially and upon reconsideration.  Cole timely requested an administrative hearing.

Administrative Law Judge Perry J. Rhew ("ALJ Rhew") held a hearing on March 9, 2004.  Cole was represented by counsel and testified on his own behalf.  Lynn Smith testified as a vocational expert.  ALJ Rhew issued a decision on March 24, 2004, finding that Cole was not disabled.  ALJ Rhew's decision became the final decision of the Commissioner when the Appeals Council denied further review.

Cole filed an appeal to this Court.  On August 16, 2005, Magistrate Judge George Limbert reversed the finding of the Commissioner and remanded the case for further development of the record.  In particular, the court found that there was not substantial evidence to support ALJ Rhew's determination that Cole did not meet or equal the listing at 20 C.F.R. Part 404, Subpart B, Appendix 1, §12.05 ("§ 12.05") and that there were unresolved conflicts related to the assessment of Cole's functional capacity.

While Cole's first application was under review by the Appeals Council, he filed a second application for SSI.  This application also was denied initially and upon reconsideration, then it was joined with Cole's first application for a hearing.

Cole's cases were assigned to Administrative Law Judge Thomas Ciccolini ("ALJ Ciccolini").  ALJ Ciccolini held a hearing on October 19, 2006.  Cole was represented by counsel and testified on his own behalf.  Mark Anderson testified as a vocational expert ("VE"). On November 13, 2006, ALJ Ciccolini issued a decision finding that Cole was not disabled.  When the Appeals Council denied further review, ALJ Ciccolini's decision became the final decision of the Commissioner.

Cole filed this action on June 21, 2007.  Cole claims the ALJ erred because (1) his decision that Cole's conditions do not meet or equal the listing at § 12.05 is not supported by substantial evidence and (2) he erred finding that Cole was capable of performing work that is simple; not involving a high pace; with no production quotas, with minimal interaction with the public, co-workers, and supervisors; and with no driving.

## II.  Evidence

### A.    Personal and Vocational Evidence

Cole was born on February 23, 1967 and was 39 years old at the time of his hearing. He is a "younger" person within the meaning of 20 C.F.R. § 404.1563(c).  Cole attended high school through the 9th grade, including special education classes.  He has no past relevant work experience.  Cole was found disabled on April 1, 1997, but his benefits were suspended when he was incarcerated.

### B.    Medical Evidence

Cole's parole officer referred him to Murtis H. Taylor Multi-Service Center ("Murtis") for evaluation after he experienced anxiety attempting to re-integrate after 12 years' incarceration.  Mary J. Harrison ("Harrison"), a registered nurse clinical specialist at Murtis, evaluated him on February 8, 2002.  Transcript ("Tr."), Doc. 12 at 110-14.  Harrison noted that he had been treated with Haldol as a child for symptoms of anxiety and psychosis and that his mother has been mentally ill since Cole was young.  Cole reported that his hobbies were writing poetry and going to art exhibits.  Harrison found Cole to be oriented times three and possessed of an adequate fund of knowledge and good judgment. She detected no evidence of psychosis, but she did diagnose Cole as suffering from an adjustment

disorder with anxiety and assigned him a Global Assessment of Functioning ("GAF") of 50.[1]

Harrison re-assessed Cole on February 18, 2002.  Tr. 116-20.  Cole told Harrison that his parole officer had ordered him to attend AA meetings.  The evaluator found Cole to be euthymic in mood and exhibiting coherent speech and organized thought.  She diagnosed Cole as suffering from a delusional disorder--persecutory type and assigned him a GAF of 60.[2]

In March 2002 Cole completed a questionnaire at the request of the Bureau of Disability Determination ("the Bureau").  Tr. at 82-91.  Cole reported that he cooked twice a week, did laundry once a month, dusted twice a week, and washed dishes once a week. He estimated that he did some work about an hour a week on average.  He also reported shopping twice a week, attending church daily, visiting his mother or friends once a week, and not traveling very far from home.

The Bureau referred Cole to Herschel Pickholtz, Ed. D, for evaluation.  Tr. at 132-37. Dr. Pickholtz saw Cole on March 7, 2002.  He found Cole to be neat and within the normal range in terms of hygiene, mental status, affect, and cognitive functioning.  Cole denied using drugs and alcohol and was inconsistent or uncertain about his past history of treatment for psychological disorders and about why he was incarcerated.  Cole described himself as living in a shelter, watching television, playing cards, taking walks downtown,

---

[1] A GAF of 41-50 indicates serious symptoms (*e.g.* suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or chool functioning (*e.g.* no friends, unable to keep a job).

[2] A GAF of 51-60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflict with peers of co-workers).

and attending church on Sunday.   Dr. Pickholtz administered the Wechsler Adult Intelligence Scale-III ("WAIS-III") to Cole and assessed his Full Scale I.Q. as 67, his Verbal I.Q. as 69, and his Performance I.Q. as 72.   Cole's levels of attention, concentration, and memory fell within the moderately retarded range, although Dr. Pickholtz believed that these scores and the I.Q. scores understated Cole's capacities and that Cole probably fell into the low end of the average range.   Dr. Pickholtz diagnosed Cole as having some tendencies toward exaggeration and selective levels of motivation and malingering, a mixed personality with narcissistic and anti-social features, and moderate psychosocial stressors.
 Dr. Pickholz made the following summary assessment of Cole:

> His overall abilities to relating to co-workers and others in a reliable and stable fashion seem to fall within the lower end of the average range.  His overall abilities to attend and remember work-related activities, events and sequences of instructions seem to fall within the lower end of the average range relative to daily living activities and his reading comprehension.  His overall abilities to work eight-hour work activities relative to speed, consistency and reliability, from a psychological perspective, seem to fall within the mild range of impairment at worst. His overall abilities to handle work adaptation and social interaction, as a result of his characterological features, seem to fall within the mild range of impairment.  I would not suggest that he monitor benefits in an independent fashion pending additional evaluation relative to his usage of drugs and alcohol in the past, which he tends to mitigate.

Tr. at 137.

On April 3, 2002, K. Stailey Sterger, Ph. D., a non-examining psychologist, completed a Psychiatric Review Technique based on Cole's record.  Tr. at 139-52.  Dr. Sterger determined that Cole had a personality disorder best described as a mixed personality with tendencies toward exaggeration and selective levels of motivation.  Dr. Sterger also found that Cole had mild difficulties in maintaining concentration, persistence, or pace, but he found no other functional limitations.  Alice L. Chambly, Psy. D., affirmed

this evaluation on April 3, 2002.

Cole continued to receive treatment at Murtis.  In October 2003 through February 2004, Harrison uniformly found him to be neatly to adequately groomed, cooperative, coherent, and oriented.  Tr. at Tr. at 156-59, 161-62.  Cole reported sleeping well.  He denied hallucinations or homicidal or suicidal thoughts, and he was generally euthymic. Counselors changed his diagnosis from delusional disorder--persecutory type to explosive disorder without paranoid delusions and switched his medication from Zyprexa to Seroquel.

On February 17, 2004 Cole received a cortisone injection after experiencing shoulder pain and exhibiting crepitation.  Tr. at 400A.

Harrison completed a Mental Residual Function Capacity assessment of Cole on March 8, 2004.  Tr. at 398-400.  Harrison assessed Cole as fair in his ability to follow work rules, use judgment, maintain regular attendance and be punctual, deal with the public, relate to co-workers, and work with or in proximity to others and assessed him as poor to nonexistent in his ability to maintain attention and concentration for extended periods, respond appropriately to changes in routine setting, interact with a supervisor, function independently without special supervision, deal with work stress, and complete a normal workday without interruptions from psychologically-based symptoms.  Harrison assessed Cole's intellectual functioning to be fair with respect to understanding, remembering, and carrying out simple job instructions and poor with respect to  understanding, remembering, and carrying out complex or detailed job instructions.  Harrison also assessed Cole's ability to maintain his appearance, socialize, and leave home on his own as fair and his ability to behave in an emotionally stable manner, relate predictably in social situations, and manage funds or schedules as poor to nonexistent.  When asked to provide findings to support

6

these conclusions or make additional comments, Harrison wrote:  "Client diagnosed with Intermittent Explosive Disorder r/o Paranoid Delusional Disorder and has Borderline IQ. Client has difficulty with authority figures--has an explosive tendency when provoked. Client with very limited cognitive potential."  Tr. at 400.

The Bureau referred Cole to Deborah Koricke, Ph. D., for a disability assessment. Dr. Koricke  saw Cole on October 16, 2004.  Tr. at 402-06.  Cole's appearance was neat and his hygiene was adequate, and his speech and thought were coherent and understandable.  His affect was blunted, and he explained that he had been feeling depressed and anxious and was having trouble sleeping.  Nevertheless, he was oriented and alert.  Cole denied being suicidal but said that he sometimes had auditory hallucinations in the form of voices telling him to do things.  Cole reported being close to his mother and sister and seeing them frequently and said that he maintained friendships outside the family.  He reported maintaining his living quarters.  His effort during testing was thought to be poor and inconsistent, and the tester considered him to be malingering.  Dr. Koricke assigned Cole a GAF of 71.[3]

Franklin D. Krause, M.D., examined Cole on or about November 18, 2004 at the request of the Bureau.  Tr. 407-15.  Dr. Krause noted that Cole lived alone; did his own cooking, cleaning, and shopping; and otherwise cared for himself.  Cole reported sitting without difficulty but said he could stand for a minute and walk for 15 minutes.   He also reported seeing a psychiatrist four times a week.  Dr. Krause ordered x-rays of Cole's back

---

[3]  A GAF of 71-80 indicates that if symptoms are present, they are transient and expectable reactions to psychosocial stressors (*.e.g*, difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (*e.g.*, temporarily falling behind in school work).

7

and performed manual muscle testing.  He diagnosed Cole as having a history of emotional

problems, a history of hepatitis C with minimally elevated hepatic enzymes, and a history

of lower back pain.  Dr. Krause concluded that Cole was "capable of performing sustained,

remunerative employment."  Tr. at 408.

Kenneth R. Felker, Ph.D., examined Cole on May 20, 2005 at the request of the

Bureau.  Tr. at 428-33.  Cole reported not being able to remember his longest or most

recent employment and said that he had no history of psychiatric hospitalization.  Dr. Felker

described Cole's grooming and hygiene as marginal and found him to be cooperative.  He

described Cole's speech and thought as normal.  Cole described himself as somewhat

depressed, but his energy was fair and he denied thoughts of suicide.  Dr. Felker found

Cole to be oriented but somewhat restricted in his attention span and concentration.  Cole

reported his daily activities as follows:

> Bobby said that he usually gets up between 5 and 6 am.  He washes, gets dressed
> and then has breakfast.  After that he walks around the city.  Bobby said that he
> usually goes to the Cosgrove Center for lunch.  In the evening he comes back to the
> shelter and has something to eat there.  He said that a meal is available in the
> evening.  After that he visits with other men that live at the shelter and play cards.
> He usually goes to bed at about 10:30 pm.  He indicated that he tries to attend
> religious services fairly often.  He does a small amount of reading and spends his
> time either walking around the city or playing cards.

Tr. at 430.  After administering the WAIS-III to Cole, Dr. Felker found that Cole's Full Scale

I.Q. was 70, with a Verbal I.Q. of 69 and a Performance I.Q. of 77.  Dr. Felker concluded:

> Bobby's Full Scale IQ places him at the Borderline Range of Adult Intellectual
> Functioning.  This seems to be an underestimate of his capability.  He presents as
> being somewhat more able than this and it is likely that his optimal functioning is at
> the dull normal level.  His effort on the tests was minimal and he seemed to have
> difficulty sustaining his focus on the tasks and seemed to give up rather easily.

Tr. at 430.  Dr. Felker assessed Cole as being mildly impaired in his ability to concentrate

and attend to tasks, mildly impaired in his ability to relate to others and deal with the general public, and mildly to possibly moderately restricted in his ability to relate to work peers and supervisors and tolerate the stressors of work.  He diagnosed Cole as suffering from a mixed personality disorder with evidence of antisocial features and assigned him a GAF of 60.

State agency psychologist Douglas Pawlarczyk ("Pawlarczyk") reviewed Cole's record and completed a Psychiatric Review Technique on June 1, 2005.  Tr. at 434-445. He found that Cole suffered from a major depressive disorder (Affective Disorder, 20 C.F.R. Part 404, Subpart B, Appendix 1, §12.04) and a mixed personality disorder and intermittent explosive disorder (Personality Disorders, 20 C.F.R. Part 404, Subpart B, Appendix 1, §12.08) but that these impairments were not severe.  Pawlarczyk opined that Cole suffered mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace.  Pawlarczyk concluded that Cole had no severe mental impairment and that his allegations of limitations due to anxiety were partially credible.

Cole continued his treatment at Murtis from January 2005 through September 2005. Tr. at 495-98.  He was generally described as euthymic, alert, and appropriately dressed, and he reported compliance with medications.  He denied hallucinations, suicidal ideation, or paranoia.  His counselor diagnosed Cole as suffering from a major depressive disorder in partial remission and intermittent explosive disorder with borderline I.Q.

Emil K. Ibrahim, M.D., examined Cole on June 28, 2006 at the request of the Bureau.  Tr. at 489-94.  Cole complained of suffering from hepatitis C and dizziness.  Dr. Ibrahim found Cole to be poorly dressed with fair grooming and hygiene, cooperative, and

9

exhibiting poor impulse control.  Cole's speech was clear but impoverished; his mood was stable; and Cole was alert and oriented.  Cole reported to Dr. Ibrahim that he had a history of hearing the devil telling him to hurt someone.  Cole also reported having worked at cleaning for as long as four months, but he could not remember his last job.  Dr. Ibrahim concluded that Cole's ability to relate to others was fair and that Cole had adequate ability to understand and follow instructions for simple tasks, poor ability to maintain attention and concentration, and that his ability to withstand stress in day-to-day activities is affected by his unemployment and poor educational level.

*C.    Hearing testimony*

Cole testified at his hearing on October 19, 2006 that he suffered from "nerves" and had trouble concentrating.  Tr. at 1-16.  He asserted that for about a year or two he had been unable to concentrate sufficiently to read a book or watch a television program.  Cole stated that he had completed the 9th grade but could not remember if he had taken special education classes.  He reported visiting a psychological counselor four times a week, that he was compliant with his medication, and that the medication helped him to stay calm. He also reported that walking helps him to stay calm and avoid violence.  Cole testified that he used public transportation, shopped, stays in touch with friends, and writes poetry.  He opined that he could do work with his hands if he were seated.  He claimed that his back hurts if he lifts more than five pounds.

The VE reviewed Cole's file and listened to his testimony.  The ALJ posed a hypothetical question, asking if there would be work for an individual with a light residual functional capacity with the mental limitations of no complex tasks or detailed instructions; no high pace or high production quotas; minimal interaction with co-workers, supervisors,

10

and the public; and no driving as part of the job.  Tr. at 518-19.  The VE testified that there were jobs for such an individual, including inspector and hand packager, assembler of small products, and assembler of plastic hospital products. Tr. at 519-21

### III.  Standard for Disability

A claimant is entitled to receive SSI benefits under the Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent him from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the

claimant's impairment does prevent him from doing his past relevant work, if other work

exists in the national economy that the claimant can perform, the claimant is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

IV.  Summary of Commissioner's Decision

In relevant part, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since the date of his application for supplemental security income benefits of January 25, 2002.

2. The medical evidence establishes that the claimant has severe borderline intellectual functioning; obesity; hepatitis C; a history of back pain; has been diagnosed with a mixed personality; and has been diagnosed with malingering, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

3. The claimant has an underlying medically determinable impairment which could reasonably cause pain or other symptoms.  The claimant's allegations of pain and limitations have been carefully evaluated pursuant to Social Security Ruling 96-7p and are not found to be credible to the extent alleged.

4. The claimant was born February 23, 1967 and is currently 39 years of age.

5. Exhibit 3A documents a 9th grade education while Exhibit 2E documents a 10th grade education with special education.  Thus, the Administrative Law Judge finds that the claimant completed the 9th grade and has a history of special education.

6. Exhibit 2E does not document any past relevant work activity.

7. The claimant retains the residual functional capacity to lift up to 20 pounds maximum, 10 pounds frequently; with a limitation to the performance of simple tasks; a restriction against the performance of complex tasks; performing work activity which should not involve high pace; with no high production quotas; with minimal interaction with the public, co-workers, and supervisors; and work which would not require the claimant to drive.

8. Based on an exertional capacity for light work, the claimant's age, education, and past relevant work experience, Section 416.969 of Regulations No. 16 and Rule 202.17, Table No. 2, Appendix 2, Subpart P, Regulations No. 4

would direct a conclusion that the claimant is "not disabled".

Tr. at 197-98.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  "Substantial evidence" is more than a scintilla of evidence but less than a preponderance of evidence.  It is evidence which a reasonable person would accept as adequate support for a proposition.  *Richardson v. Perales*, 402 U.S. 389 (1971). If the decision is supported by substantial evidence, the Commissioner's determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently.  *Kinsella*, 708 F.2d at 1059.

## VI.  Analysis

Cole claims the ALJ erred because (1) the determination that Cole's conditions do not meet listing § 12.05(C) is not supported by substantial evidence and (2) the finding that Cole retains the capacity for simple work; not involving a high pace or high production quotas; with minimal interaction with the public, co-workers, and supervisors; and without driving is not supported by substantial evidence.  The Commissioner contends that these determinations are supported by substantial evidence.  Each of Cole's alleged errors shall be examined separately.

13

*A.      Whether the ALJ erred in determining that Cole's conditions do not meet listing §
        12.05(C)*

The listing at § 12.05(C) describes a disability for mental retardation.  The

subsection provides as follows:

> 12.05 *Mental retardation.*   Mental retardation refers to significantly
> subaverage general intellectual functioning with deficits in adaptive functioning
> initially manifested during the developmental period; i.e., the evidence demonstrates
> or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements
> in A, B, C, or D are satisfied. . . .
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a
> physical or other mental impairment imposing an additional and significant work-
> related limitation of function . . . .

Cole argues that the March 7, 2002 Full Scale I.Q. of 67 and Verbal I.Q. of 69

measured by Dr. Pickholtz and the May 20, 2005 Full Scale I.Q. of 70 and Verbal I.Q. of

69 measured by Dr. Felker satisfy the first requirement for the disability at § 12.05(C) and

that the restriction of Cole to light work activity satisfies the second part of the listing.  The

Commissioner responds that both Dr. Pickholtz and Dr. Felker believed that these scores

understated Cole's capabilities and that, therefore, they are not true measures of Cole's

intellectual functioning.

The disability at § 12.05(C) requires a *valid* I.Q score of 60 through 70.  Dr. Pickholz

noted Cole's selective levels of motivation and malingering and opined that the I.Q. scores

understated Cole's capacities and that Cole probably fell into the low end of the average

range.  Dr. Felker noted that Cole's effort on the tests was minimal and also thought that

the results underestimated his capabilities.  Dr. Felker opined that Cole probably functioned

at the dull normal level.  There are grounds, therefore, for a reasonable person to question

the validity of these I.Q. scores which are near the borderline for mental retardation.

14

The question is not whether the court would have reached the same conclusion regarding Cole's intellectual functioning as the ALJ.  Rather, the question is whether the evidence supporting the ALJ's opinion would be regarded as adequate by a reasonable person.  Given the doubts expressed by the persons administering the test and the fact that the scores are near the borderline for mental retardation, the court cannot say that the ALJ's opinion is unsupported by substantial evidence.  Cole's contention that the ALJ erred in determining that Cole's conditions do not meet listing § 12.05(C) is not well-taken.

*B.*   *Whether the ALJ assessment of Cole's work-related limitations is supported by substantial evidence*

Cole argues that the ALJ's finding that Cole retains the capacity for work that is simple; not involving a high pace; having no high production quotas; with minimal interaction with the public, co-workers, and supervisors; and without driving is not supported by substantial evidence.  The Commissioner contends that the record contains substantial evidence to support the ALJ's decision.

Cole points to two documents that allegedly contradict the ALJ's estimation of Cole's work-related limitations.  First, Cole references the Mental Residual Function Capacity assessment that his counselor completed on March 8, 2004.  Harrison opined that Cole's abilities to maintain attention and concentration for extended periods, respond appropriately to changes in routine setting, interact with a supervisor, function independently without special supervision, deal with work stress, complete a normal workday without interruptions from psychologically-based symptoms, behave in an emotionally stable manner, relate predictably in social situations, and manage funds or schedules were poor to nonexistent. Second, Cole notes the report of Dr. Ibrahim after his June 28, 2005 examination of Cole.

15

Dr. Ibrahim opined in that report that Cole's ability to maintain attention and concentration was poor and that his ability to withstand stress in day-to-day activities is affected by his unemployment and poor educational level.  Cole argues that the ALJ erred by completely ignoring the opinion of Harrison, Cole's source of psychological treatment, and failed to give proper weight to the opinion of Dr. Ibrahim, an examining source.

The Commissioner responds in several ways.  Most important, the Commissioner claims that the ALJ  took these opinions into account in determining that Cole was restricted to simple tasks; barred from high-paced work with high production quotas; and restricted to jobs that had minimal interaction with the public, co-workers, and supervisors.

The Commissioner errs.  The ALJ never mentioned Harrison's Mental Residual Functional Capacity assessment anywhere in his opinion.  The ALJ described Dr. Ibrahim's assessment, tr. at 194, but did not refer to it in determining Cole's restrictions based on his capacity to handle stress, tr. at 196.

It is the province of the ALJ to reconcile inconsistent medical opinions in reaching a determination.  20 C.F.R. § 404.1527(c)(4).  The factors the ALJ should consider in weighing medical opinions include (1) whether the source has examined the claimant; (2) whether the source has treated the patient; (3) whether an opinion by a treating source is supported by medically acceptable clinical and laboratory diagnostic techniques; (4) length of the treatment relationship and the frequency of examination; (5) the nature and extent of the treatment relationship; (6) the extent to which the opinion is supported by relevant evidence; (7) the consistency of the opinion with the record as a whole; and (8) the specialization of the source of the opinion.  20 C.F.R. § 404.1527(d).   Generally, the ALJ is required to give the opinion of a treating sources more weight than the opinions of other

sources:

> [T]hese sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).  If the ALJ does not give controlling weight to the opinion of a treating source, the ALJ must give good reasons for this.  *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Harrison's Mental Residual Functional Capacity assessment was the only assessment of Cole by a treating source and the only assessment by a source having a long-term relationship with Cole.  The ALJ not only failed to give this opinion controlling weight and failed to explain why he did not give this opinion such weight, but the ALJ failed even to mention the opinion in his decision.  This was error, and the case must be remanded to the ALJ to reconcile Harrison's opinion with the rest of the record.

## VII.  Decision

For the foregoing reasons, the Court vacates the decision of the Commissioner and remands the case to the ALJ to consider the opinion of Harrison in assessing Cole's limitations and to reconcile the opinions of Harrison and Dr. Ibrahim in determining Cole's capacity to do work.

IT IS SO ORDERED.

/s/ Nancy A. Vecchiarelli
U.S. Magistrate Judge

Date: April 9, 2008